COURT OF APPEALS OF VIRGINIA


Present:  Chief Judge Fitzpatrick, Judges Willis and Clements
Argued at Alexandria, Virginia


RICHMOND DEPARTMENT OF SOCIAL SERVICES
                                            OPINION BY
v.    Record No. 1737-00-2       JUDGE JEAN HARRISON CLEMENTS
                                          MAY 29, 2001
L.P.


              FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
                       Theodore J. Markow, Judge

              Kate D. O'Leary, Assistant City Attorney, for
              appellant.

              James F. Sumpter (James F. Sumpter, P.C., on
              brief), for appellee.


     The Richmond Department of Social Services (Department)

appeals the order of the Circuit Court of the City of Richmond

denying the Department's petition to terminate the residual

parental rights of L.P. (mother) to her son, J., pursuant to Code

§ 16.1-283(C)(2).  The trial court concluded that, although the

evidence clearly supported termination of the mother's residual

parental rights in all other respects, the mother's mental

deficiency, which prevented her from properly caring for her

child, constituted "good cause" under Code § 16.1-283(C)(2) for

her inability to timely remedy the condition that led to the

placement of her son in foster care.  The Department contends the

trial court erred in reaching that conclusion.  We agree and

reverse the trial court's judgment.

                          I.  FACTS

On appeal, we view the evidence in the light most favorable to the mother, the prevailing party below, and grant to that evidence all reasonable inferences fairly deducible therefrom. See Logan v. Fairfax County Dep't of Human Dev., 13 Va. App. 123, 128, 409 S.E.2d 460, 463 (1991). So viewed, the evidence established that J. was born October 18, 1989. His mother, who was forty-seven or forty-eight years of age at the time of the termination hearing, signed an entrustment agreement in June 1995 granting temporary custody of J. to the Department. On June 29, 1995, J. was placed in the foster home of K.T. and has remained in K.T.'s care since that time.

J. has attention deficit hyperactivity disorder and also suffers from pervasive learning developmental delay. He exhibits some autistic, schizophrenic, and psychotic behaviors as a result. While mainstreamed into several regular classes at school, J. continues to attend some special education classes and still has problems with math, science, and writing. K.T. spends a minimum of thirty minutes an evening going over his school work with him, reinforcing what he might have missed at school or helping him complete tasks that he failed to do at school. This extra work has helped J. achieve some success in school.

J. has also had difficulty coping with the intrinsic instability of the foster care environment. When faced with the possibility of having to leave the home of K.T. to go live with or visit relatives who expressed an interest in having custody of him, he exhibited aggressive and disruptive behavior. At such times, he had to be sedated with drugs in order to attend school and, even then, still sometimes disrupted his classes. Prior to

and after visits with his relatives, J. was withdrawn and preoccupied at home and his schoolwork suffered, regressing as much as six months in his studies.

Despite his developmental problems and associated special needs, J. has, as counsel for the mother concedes, flourished under K.T.'s care. K.T. is interested in adopting J. She loves J. and wants to give him the permanency and stability in his life that, in her opinion, only an adoption can bring him. She also feels strongly that J. should continue to have a close relationship with his mother even if he is adopted, for both J.'s and his mother's sakes. If K.T. adopts J., she says she would foster contact between J. and his mother, as she has during J.'s foster care.

There is no doubt that J.'s mother also loves him and wants to be with him. Since entrusting J. to the Department in 1995, the mother has cooperated in the Department's various efforts to help her remedy her problems and regain custody of her son. She has worked with several agencies in Richmond that offer support and services to adults with mental retardation—the Department of Mental Health and Retardation, the Comprehensive Health Investment Project, Richmond Behavioral Health Authority, and Richmond Residential Services—to obtain housing and services for herself and to attend parenting and life skills programs. In May 1998, after a stay with her sister in Atkins, Virginia "did not work out," the mother moved into a group home in Cedar Bluff, Virginia. Despite living some distance from J., the mother still attempts to see him when she can and talks to him on the telephone two or three times a week.

The mother continues, however, to have her own special needs and to be unable to care for her son because of her mental retardation. Robert Goodman, J.'s current foster care worker, testified that the decision was made by the Department not to allow J. to join his mother at her current residence because "the mental health people that worked with her did not feel that she was able to care for her son" and that she "needed assistance" herself. According to Goodman, who has worked with J. and his mother since July 1996, the mother is still unable to cope with J.'s special needs and his behavioral problems. For example, Goodman testified, J. had to be returned to K.T.'s home around 1:00 a.m. one night toward the end of 1998 because the mother was unable to handle J. during a Christmas visit.

Glenna Cordle, the mother's case manager at the group home in Cedar Bluff, testified on behalf of the mother. She stated that, although the mother is doing "well on her daily living skills," she "still needs assistance in taking care of herself on a daily basis," including help with taking her medication. While confident that the mother could live in an apartment on her own with the requisite assistance, Cordle had no such confidence that the mother could properly care for a child in such an environment.

John Trembly, the mother's case manager from 1996 through 1998 with Richmond Behavioral Health Authority, testified that, based on his observations of the mother and her interaction with J., the mother certainly loved and cared about J. but did not have the "skills or cognitive ability to function adequately as a good parent, looking out for his welfare and well-being." For

example, the mother would not, according to Trembly, be able to help J. with his homework because of her mental limitations.

Londella Hamilton, the mother's program counselor with Richmond Residential Services during the same time period, also observed visits between the mother and J. in the foster home she found for the mother. Hamilton testified the mother was not "able to adequately parent [J.]." The mother did not, Hamilton testified, understand that a parent has to sometimes say "no" to a child and make him do things he does not want to. For example, the mother would not, according to Hamilton, make J. wear a seatbelt when he did not want to. Likewise, according to Hamilton, the mother was unable to understand what raising a child entailed. While she knew a child needed to be fed, housed, clothed, and kept safe, she did not, Hamilton opined, know "how to go about providing those types of needs for a child."

Hamilton further testified that, based on the mother's occasionally erratic and inappropriate behavior and her inability without supervision and assistance to take her medicine correctly and to clean up and maintain a safe home, the mother would never likely be able to live unsupervised on her own, much less with a child. Even though the mother "really loves her son," she "is not able to care for him as a parent," Hamilton concluded. She added, however, that she "would hate to see [the mother] left out of [J.'s] life completely because they do have a bond."

On November 23, 1999, the Department petitioned the Juvenile and Domestic Relations District Court of the City of Richmond to terminate the residual parental rights of the mother and to allow it to place J. for adoption. The petition was accompanied by a

foster care service plan with the new goal of "adoption," the goals of "return home" and "placement with relatives" no longer, according to the plan, being viable alternatives. On January 24, 2000, the juvenile court terminated the residual parental rights of the mother. That same day, the mother noted her appeal of the juvenile court's order.

The Circuit Court of the City of Richmond heard the matter ore tenus on April 18, 2000. At the conclusion of the hearing, the trial court requested briefs from the parties on the issue of "good cause" under Code § 16.1-283(C)(2). Following receipt of those briefs, the court issued its order on June 20, 2000, finding by clear and convincing evidence that (1) the termination of parental rights was clearly in the child's best interests and (2) the mother was unable to substantially remedy the condition that led to the placement of her son in foster care within a reasonable period of time, despite the Department's provision of reasonable and appropriate services, and likely would never be able to do so. The court ruled, however, that it could not terminate the mother's parental rights under Code § 16.1-283(C)(2) because, even though the other requisite conditions set forth in that section were proven by clear and convincing evidence, the mother's inability to remedy the condition that led to her son's placement in foster care was with "good cause," namely, the mother's mental retardation. The mother could do no more to resolve her intellectual limitations and regain custody of her child, the court found, than she had.

On July 1, 2000, the Department noted its appeal of the trial court's final order of June 20, 2000. The parties having

submitted their briefs and presented their arguments, the case is now before us for resolution.[1]

## II.  ANALYSIS

The Department contends the trial court erroneously concluded that the mother's mental deficiency constituted "good cause" under Code § 16.1-283(C)(2) for her failure to timely remedy the conditions that led to J.'s placement in foster care.  We agree with the Department's contention.

The best interest of the child is the paramount consideration in cases involving the termination of a parent's residual parental rights.  <u>Logan v. Fairfax County Dep't of Human Dev.</u>, 13 Va. App. 123, 128, 409 S.E.2d 460, 463 (1991).  Nevertheless, "'the rights of parents may not be lightly severed but are to be respected if at all consonant with the best interests of the child.'"  <u>Ward v. Faw</u>, 219 Va. 1120, 1124, 253 S.E.2d 658, 661 (1979) (quoting <u>Malpass v. Morgan</u>, 213 Va. 393, 400, 192 S.E.2d 794, 799 (1972)).  In considering the matter before us, we must have

> a respect for the natural bond between children and their natural parents.  The preservation of the family, and in particular the parent-child relationship, is an important goal for not only the parents but also government itself. . . .  Statutes terminating the legal relationship between parent and child should be interpreted consistently with the governmental objective of preserving, when possible, the parent-child relationship.

---

[1] Inexplicably, the guardian <u>ad</u> <u>litem</u> for the child did not file a brief or appear for argument on behalf of the child in this case on appeal, despite having been given proper notice of this appeal and having been appointed by the trial court for the specific purpose of representing the child in this appeal.

Weaver v. Roanoke Dep't of Human Res., 220 Va. 921, 926, 265 S.E.2d 692, 695 (1980). "The termination of parental rights is a grave, drastic, and irreversible action. When a court orders termination of parental rights, the ties between the parent and child are severed forever, and the parent becomes 'a legal stranger to the child.'" Lowe v. Dep't of Pub. Welfare of City of Richmond, 231 Va. 277, 280, 343 S.E.2d 70, 72 (1986) (quoting Shank v. Dep't of Soc. Servs., 217 Va. 506, 509, 230 S.E.2d 454, 457 (1976)).

Code § 16.1-283 establishes the procedures and grounds for the termination of residual parental rights. Code § 16.1-283(C)(2) provides, in pertinent part, that

> [t]he residual parental rights of a parent
> . . . of a child placed in foster care as a
> result of . . . an entrustment agreement
> entered into by the parent . . . may be
> terminated if the court finds, based upon
> clear and convincing evidence, that it is in
> the best interests of the child and that
> . . . [t]he parent . . ., without good cause,
> [has] been unwilling or unable within a
> reasonable period of time not to exceed
> twelve months from the date the child was
> placed in foster care to remedy substantially
> the conditions which led to or required
> continuation of the child's foster care
> placement, notwithstanding the reasonable and
> appropriate efforts of social, medical,
> mental health or other rehabilitative
> agencies to such end.

(Emphasis added.)

Here, J.'s mother entrusted care of J. to the Department in 1995 because she was unable to properly care for him due to her mental problems. J. has been in foster care ever since, almost half of his life. He has been with the same foster care family during that time and has thrived under the care of his foster

mother, with whom he has established strong bonds.  J.'s foster mother wishes to adopt him and bring stability and permanency to his life.  J.'s mother continues, despite the passage of more than five years, to have special needs because of her mental retardation.  She will, as the trial court properly inferred from the evidence, likely never be able to adequately care for J. and regain custody of him.

There is no question, on the facts of this case, that termination of the mother's residual parental rights so that J. can be adopted is, as the trial court concluded, in J.'s best interests.  See Kaywood v. Halifax County Dep't of Soc. Servs., 10 Va. App. 535, 540, 394 S.E.2d 492, 495 (1990) (noting that having to wait a long time to find out when, or even if, a parent can resume his parenting duties is not in child's best interests).  Likewise, the record clearly supports the trial court's determination that the mother was unable, due to her continuing and likely permanent mental deficiency, to substantially remedy within a reasonable period of time those conditions that led to J.'s placement in foster care, notwithstanding the reasonable and appropriate efforts of the Department and other agencies to that end.

Nevertheless, the trial court declined to terminate the mother's residual parental rights under Code § 16.1-283(C)(2) because, in the court's opinion, the mother's inability to remedy the condition that led to J.'s foster care placement was not without "good cause," as required by the statute.  According to the trial court, the mother's mental retardation constituted "good cause."

The resolution of this case rests upon the single issue of whether a parent's mental deficiency constitutes "good cause" under Code § 16.1-283(C)(2), where that mental deficiency disables, likely permanently, the parent from properly caring for and regaining custody of his or her child who has been placed in foster care. In other words, we must decide whether a mental deficiency that prevents a parent from discharging his or her parental responsibilities, when that deficiency cannot be remedied within a reasonable time, constitutes a valid legal excuse under Code § 16.1-283(C)(2) for that parent's inability to timely cure the circumstances that led to the child's foster care placement. This issue is one of first impression in Virginia.

In determining whether such a mental disability is encompassed in the words "good cause," as used in Code § 16.1-283(C)(2), we are guided by the following well-settled principles of statutory construction:

> In construing a statute the court should seek to discover the intention of the legislature, as ascertained from the act itself when read in the light of other statutes relating to the same subject matter, and in the light of the reasons which led to the passage of the act and the evils which it was intended to cure. If possible, the language used should always be so construed as to give effect to the statute.
>
> *     *     *     *     *     *     *
>
> . . . "It is to be inferred that a code of statutes relating to one subject was governed by one spirit and policy, and was intended to be consistent and harmonious in its several parts and provisions. It is, therefore, an established rule of law that all acts in pari matria are to be taken

together, as if they were one law; and they
are directed to be compared in the
construction of statutes, because they are
considered as framed under one system, and
having one object in view."

Stanley v. Tomlin, 143 Va. 187, 195, 129 S.E. 379, 382 (1925)

(quoting Fox's Admr. v. Commonwealth, 57 Va. (16 Gratt.) 1, 10

(1860)).

Although they address somewhat different circumstances, Code

§§ 16.1-283(B)(2) and 16.1-283(C)(2) clearly relate to the same

subject matter, have the same basic objectives, are framed under a

single system, and, thus, are "governed by one spirit and policy."

Stanley, 143 Va. at 195, 129 S.E. at 382.  Code § 16.1-283(B)(2)

provides, in pertinent part, that

[t]he residual parental rights of a parent
. . . of a child found by the court to be
neglected or abused and placed in foster care
as a result of . . . an entrustment agreement
entered into by the parent . . . may be
terminated if the court finds, based upon
clear and convincing evidence, that it is in
the best interests of the child and that
. . . [i]t is not reasonably likely that the
conditions which resulted in such neglect or
abuse can be substantially corrected or
eliminated so as to allow the child's safe
return to his parent . . . within a
reasonable period of time.

Code § 16.1-283(B)(2) further provides that proof of the following

condition constitutes prima facie evidence that "[i]t is not

reasonably likely that the conditions that resulted in [the]

neglect or abuse [of the child] can be substantially corrected or

eliminated so as to allow the child's safe return to his parent

. . . within a reasonable period of time":

The parent . . . [is] suffering from a mental
or emotional illness or mental deficiency of
such severity that there is no reasonable
expectation that such parent will be able to

undertake responsibility for the care needed
by the child in accordance with his age and
stage of development . . . .

We do not believe, in comparing Code §§ 16.1-283(B)(2) and 16.1-283(C)(2), that the legislature intended, in enacting those similar statutes, that a parent's mental deficiency akin to the mother's mental deficiency in the case before us constitutes both a reason to permit termination of parental rights under one statute and a reason to preclude termination of parental rights under the other. Indeed, we would be sanctioning such obvious contradiction were we to conclude that a parent's mental deficiency that prevents her from caring for her child constitutes "good cause" under Code § 16.1-283(C)(2).

Moreover, "the best interests of the child must be the primary concern of the court." Stanley v. Fairfax County Dep't of Soc. Servs., 242 Va. 60, 63, 405 S.E.2d 621, 623 (1991). The purpose of Code § 16.1-283(C)(2) is to ensure, if possible, that the best interests of the child are achieved by "protect[ing] the family unit and attendant rights of both parents and child, while assuring resolution of the parent-child relationship without interminable delay." Lecky v. Reed, 20 Va. App. 306, 312, 456 S.E.2d 538, 540 (1995). "It is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his [or her] responsibilities." Kaywood, 10 Va. App. at 540, 394 S.E.2d at 495.

In concluding in Lecky that the young age of the mother did not constitute "good cause" under Code § 16.1-283(C)(2), we noted that

age of the parent . . . is not a circumstance which prevails over the best interests of the child. Nothing in this record . . . suggests that the mere passage of time would resolve her difficulties. Thus, further delay would prolong [the child's] familial instability without the promise of benefit to him, a result clearly contrary to the child's best interests. Under such circumstances, mother's age does not alone constitute good cause to excuse her failure to resolve the conditions which prompted [the child's] foster care in accordance with statute.

20 Va. App. at 312, 456 S.E.2d at 541.

The same can be said for the mother's mental deficiency in this case. Nothing in the record suggests that the mother will ever be able to assume responsibility for the care of her child. Waiting indefinitely to find out if the mother might someday remedy the conditions that resulted in J.'s foster care placement only prolongs the lack of stability and permanency in J.'s life, with no guarantee or even reasonable likelihood that the mother will ever be able to adequately care for J. in the future. Thus, like the mother's age in Lecky, the mother's mental deficiency in this case does not prevail over the child's best interests.

For these reasons, we conclude that a parent's mental deficiency that is of such severity that there is no reasonable expectation that such parent will be able within a reasonable period of time befitting the child's best interests to undertake responsibility for the care needed by the child in accordance with the child's age and stage of development does not constitute "good cause" under Code § 16.1-283(C)(2). Hence, we hold that the present mother's inability to remedy the conditions that led to J.'s placement in foster care was without "good cause." The trial court's determination to the contrary was, therefore, erroneous.

Accordingly, we reverse the judgment of the trial court and order the residual parental rights of the mother terminated in accordance with Code § 16.1-283(C)(2).

Reversed.