COURT OF APPEALS OF VIRGINIA


Present:  Chief Judge Fitzpatrick, Judge Annunziata and
          Senior Judge Coleman


MICHAEL VAN BUREN

                                        MEMORANDUM OPINION[*]
v.   Record Nos. 2618-02-2 through          PER CURIAM
                 2621-02-2               APRIL 29, 2003

CITY OF RICHMOND
 DEPARTMENT OF SOCIAL SERVICES


            FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
                    Theodore J. Markow, Judge

            (Scott D. Cardani, on briefs), for appellant.

            (Kate D. O'Leary, Assistant City Attorney;
            Marc Yeaker, Guardian ad litem for the infant
            Johnny Collins; Karen Matthews, Guardian ad
            litem for the infants Catherine, Christina
            and Anthony Van Buren, on briefs), for
            appellee.


     In four separately filed and numbered appeals, Michael Van

Buren (father) appeals the decision of the circuit court

terminating his parental rights to his three children:  Catherine

Van Buren[1] (Rec. No. 2618-02-2); Christina Van Buren (Rec. No.

---

     [*] Pursuant to Code § 17.1-413, this opinion is not
designated for publication.

     [1] The record contains at least two different spellings for
each twin girl's name.  In this opinion, we will use the names
listed in the final order dated September 3, 2002, and refer to
the twins as Christina and Catherine.

2619-02-2); and Anthony Van Buren (Rec. No. 2621-02-2), and his stepson Johnny Collins[2] (Rec. No. 2620-02-2).

He contends the evidence was insufficient to support the terminations under subsection (1) or (2) of Code § 16.1-283(C). Father also asks this Court to apply the ends of justice exception to Rule 5A:18 and find that the trial court applied an incorrect standard to support termination. Upon reviewing the record and briefs of the parties, we conclude that these appeals are without merit. Accordingly, we summarily affirm the decisions of the trial court. Rule 5A:27.

BACKGROUND

On July 7, 1999, the Richmond Department of Social Services (RDSS) removed the children and placed them in foster care. The

---

[2] Although father filed a separate notice of appeal in the trial court appealing the September 3, 2002 "Order for Involuntary termination of Residual Rights" as it relates to Johnny Collins, his stepson, the manuscript record contains no final order from the trial court terminating Michael Van Buren's parental rights to Johnny Collins.

The September 3, 2002 final order contained in the manuscript record addresses and terminates only the residual parental rights of Johnny's biological mother, Cassie Van Buren. That order was endorsed by Cassie's attorney, Robert J. Jacobs, and not by Michael's attorney, Scott Cardani, who filed the notice of appeal and opening brief. Because the trial court did not enter a final order terminating father's parental rights to Johnny Collins, we dismiss father's appeal in Record No. 2620-02-2 as it relates to Johnny.

Moreover, because Johnny Collins is neither father's biological nor adoptive son, but his stepson, father had no residual parental rights for the trial court to terminate. Therefore, father had no standing to contest the termination of Johnny's parents' rights.

-

twins, Catherine and Christina, were three years old at the time of removal, Anthony was four and Johnny was eight. On July 8, 1999, Charlotte Scharff with RDSS filed petitions alleging the children were abused and neglected.

## The First Hearing

On February 20, 2002, the trial court conducted a de novo hearing on RDSS's petition to terminate father's parental rights.

Kelly Davis, a case worker with RDSS, began working with the family in July 1999. She related how the three younger children had bruises and bite marks on their arms and legs when she first saw them. Davis filed the initial foster care plan on September 1, 1999, with a goal of return home by the target date of March 2000. The parents were to have bi-weekly visitation with the children. RDSS provided the following services and referrals: (1) refer mother to SCAN, a parents support group; (2) refer father to Richmond Behavorial Health Authority (RBHA) for substance abuse evaluation and treatment, if necessary; and (3) refer father to Commonwealth Catholic Charities for anger management. RDSS indicated it would provide "other services if needed," involve parents in service plan updates, and inform them of court dates.

Davis and the parents returned to court in May 2000 to review the foster care plan. The report showed that mother attended all SCAN sessions. Father advised RBHA he had no substance abuse problem, so RBHA did not recommend treatment; however, father

-

attended a substance abuse education course through the Richmond Office of Community Corrections (ROCC), and in January 2000, he completed an anger management course sponsored by ROCC.  RDSS referred the parents for a parenting assessment and arranged for in-home services to work with the family.  The program goal remained "Return Home," and the target date was extended to December 2000.

In April 2000, RDSS contracted with "Wilkerson's Consulting" (Wilkerson's) to provide in-home counselors "to work with the family" twenty hours per week to teach "effective ways of parenting."  Marshelle Anderson is employed by Wilkerson's, which is a private agency providing "[i]ntensive in-home counseling, parent aid [and] therapeutic mentoring."  She and other counselors worked with the family from April 2000 until April 2001.  The frequency and length of Anderson's contact with the family increased to forty hours per week, five or six days per week. Anderson explained:

> In the beginning we were providing parenting
> services to assist [the parents] with better
> organizing their home.  Keeping the home
> clean, washing the kid's clothes.  Just
> daily living skills types of things.  We
> were also doing about 40 hours of intensive
> in-home counseling.

Anderson also worked on ways to discipline and redirect the younger children's behavior.  Anderson indicated that her company usually works with a family for a period of three to six months.  Anderson recalled that the three younger children

-

"weren't speaking" at the time and "couldn't communicate very well."  Thus, "they would bite and push . . . to get what they wanted."  According to Anderson, the three younger children "were really hard to handle."

Both case worker Davis and counselors with Wilkerson's noted that the home was disorganized and messy, and the parents were unable to control the children's behavior or maintain regular schedules and routines for things such as meals or bedtime.  Davis recalled that mother and father were receptive to recommendations and advice, but they had difficulty implementing them.  In addition to providing counselors, RDSS also provided daycare for the three younger children.

Dr. Beverley Chamblin performed psychological evaluations of father and mother in May 2000, ten months after the children were initially removed by RDSS.[3]  The purpose of the evaluation was "to help the home care workers teach the Van Burens to be more constructive parents."  Dr. Chamblin also noted RDSS's concern regarding father's "somewhat negative and controlling attitude toward some of the assistance he is given" as well as mother's "very passive . . . behavior."  Father dropped out of school in the seventh grade.  He felt that he and his wife were good parents.  Father denied having any emotional problems or any

_____

[3] RDSS moved to admit and the trial court admitted father's evaluation; however, RDSS failed to move to admit the evaluation of mother.  Therefore, her evaluation is not in the record.

-

problems with alcohol, even though his father had problems with alcohol. Father told Chamblin he "drinks a six-pack of beer a day, especially on the weekends." Father tested "within the middle of the Borderline range of intellectual functioning." Dr. Chamblin noted "[a] severe degree of intellectual impairment [a]s evidenced by the variability among his levels of achievement (ranges from moderate mental retardation to average)." However, father's "[i]ntellectual impairment is secondary to central nervous system dysfunctioning and emotional factors, namely depression." Although Dr. Chamblin could not pinpoint the origin of father's "neurological impairment," she opined that "[c]entral nervous system dysfunctioning appear[ed] to interfere the most in his intellectual efficiency." Dr. Chamblin found father's thinking and reasoning "very simplistic and concrete and very rigid." As a result, "he can think of only one alternative in each problem situation." Father's "third grade [reading] level" prevented him from taking a "self-administered parenting inventory," which required at least a sixth grade reading level. Dr. Chamblin noted "[t]here is significant evidence to suggest the presence of alcohol dependence and dysthymic depressive disorder." She opined that father's neurological impairment might stem from alcohol abuse. Personality tests revealed "an emotionally immature adult" who "uses strong defenses of denial and repression and flight and avoidance." His emotional test responses indicated "that he easily regresses under stress and can become verbally

-

aggressive."  In her summary, Dr. Chamblin recommended that father "be seen for psychiatric evaluation to discuss medical intervention for his depression."

Although mother's evaluation was not made a part of the record, see note 3, supra, evidence established that she was passive and suffered from depression for which she had begun taking medication.

In June 2000, RDSS returned the children to the parents for a "trial placement."  Wilkerson's continued to provide in-home consulting work with the family.

Davis left RDSS in October 2000, at which time Sharon Crone took over as foster care case worker.  Crone worked with the family until September 13, 2001.  Crone "saw a deterioration in the children's behavior from the time [she] received [the case]." In October 2000, the daycare facility that the children attended expressed concerns about the children's cleanliness and the behavior of the three younger children.  Crone learned of four complaints made to Child Protective Services (CPS) and spoke with a CPS worker who had visited the home and who "told [Crone] her concerns."[4]  Moreover, Crone "had seen the children on several occasions and [she] didn't see the concerns" pointed out to the

---

[4] Trina Coleman, a Child Protective Services (CPS) worker for RDSS, received a complaint in November 2000 alleging lack of supervision and possible physical abuse.  According to Coleman's testimony, RDSS determined that the complaint was founded, level three (moderate), for lack of supervision.

parents by RDSS "being addressed."  Specifically, Crone noticed that the "children were dirty" and had "multiple ear infections" for which treatment was not sought until RDSS intervened.  Also, appointments for the children at therapy were not regularly kept.

Crone "observed the house in disarray several times."  The top two bunks in the two sets of bunk beds in the children's bedroom contained "so much clutter" that the children had to sleep together in the bottom bunks.  On November 27, 2000, Crone saw "many bruises on the children."  Crone discussed the problem with the in-home workers, who indicated "they were addressing the same concerns," however, "they just weren't seeing any improvement."  On November 28, 2000, RDSS removed the children from the parents' home a second time.

On December 6, 2000, Crone filed another Foster Care Service Plan.  The program goal was "Placement with Relatives" and the target date was July 2001.  Crone explained that, at the time, RDSS had been involved with the family for seventeen months and things were not improving satisfactorily, so she felt it was time to "move on to a new goal."  The relatives recommended by the parents to care for the children eventually declined to take them, so Crone advised the parents that she intended to change the goal to adoption.  After visiting the parents and advising them of the decision, father asked her to leave.  As she was leaving, mother assaulted Crone and threatened to kill her.

-

Crone testified that father failed to follow through with further counseling at Catholic Charities. Crone also asked the parents to return to SCAN for more parenting classes, which they did from March 26 until May 7, after which "they refused to go anymore." According to Crone, the parents failed to see that Catherine attended weekly speech therapy sessions, despite arrangements being made for her to get there in a Medicaid van. Johnny also missed sessions with therapist Maureen Mayer.

When asked if any other social service agencies had been involved with the family prior to RDSS's involvement, Crone testified that when Catherine and Christina were born in Caroline County, "they were removed for a very short time," and Johnny and Anthony "were living in the aunt's house."

Crone observed visitations after the children were removed in November 2000. The parents "had poor interaction" with the children. Specifically, Crone noted that father was "very rough with the children" and had to be redirected several times. Crone also had concerns that father refused to address apparent problems with his use of alcohol.

Crone noted that Johnny, although a child, "was often given a caretaker role." It appeared to Crone that he "wasn't getting his emotional needs met." Crone recalled that mother and father often argued and screamed at each other, causing the children anxiety.

Dr. Jennifer Paul performed psychological evaluations of Anthony and Christina. Anthony, who was five years old at his

-

June 2001 evaluation, "was very inattentive."  He jumped on things and had a hard time sitting still.  His "attentional skills were so poor," he was unable to complete an intelligence test intended for children his age.  Therefore, Dr. Paul could not determine his IQ.  His child development inventory indicated significant developmental delays.  Dr. Paul gauged Anthony's overall abilities "at the 2 year, 4 month level," two years, eight months below his chronological age.  Dr. Paul posited that Anthony's "developmental delays may be related both to cognitive delays/limitations and also to previous environments."  She was "unclear how much stimulation he received in his previous environments and whether or not he received enough stimulation to promote normal development."  "Behaviorial reports and observations" were "consistent with a diagnosis of Attention Deficit Hyperactivity Disorder [ADHD]"  According to Dr. Paul, "Anthony will need continued stimulation both at home and through a structured school program."

Christina's August 2001 test results indicated that she "has significant developmental delays," especially in speech, for which she needs immediate therapy.  Like Anthony, Christina suffers from ADHD.  She tested at least one year below her peers in every category.  Dr. Paul said that Christina needed structure and consistency at home and at school and that a behavioral modification system should be implemented.  Dr. Paul recommended that both children be taken to a pediatrician or psychiatrist to

-

discuss the possibility of using medication to control effects of their ADHD condition.  She also made several other recommendations for the parents, foster parents, and support personnel working with Anthony and Christina.

In September 2001, Jenny Money took over for Crone as the foster care case worker.  She testified that Johnny had been in foster care since November 2000 and is doing well in school and in the foster home.  Christina, Catherine and Anthony are in a therapeutic foster home and are "doing marvelously."  Money explained that therapeutic foster parents are trained to deal with a child's special needs.  All three younger children demonstrated delayed development in speech.  Christina also "suffers from underlying anxiety," and she and Anthony have been diagnosed as having ADHD.  In addition, Anthony shows signs of mental retardation.  All three younger children see a psychiatrist for medication and participate in speech therapy.  Anthony began taking medication in August 2001, and Christina began taking medication in October 2001.  Money stated that the children still need supervision and structure.

When Money took over in September 2001, she reminded the parents about the services already in place.  Money also recommended that mother participate in an anger management class and that father attend Alcoholics Anonymous (AA).  Money directed father to obtain documentation of AA meetings he attended.  According to Money, the parents have attended fourteen out of a

-

possible 132 parenting classes offered during the time RDSS was involved in their case, making their attendance rate 11%. Mother never attended anger management class, and father failed to provide written verification that he attended any AA meetings. Father told Money the AA meetings depressed him.

When Money first got the case, the parents' home was condemned because of lead paint and electrical and plumbing deficiencies. The parents moved in with friends, then lived in a hotel for a few weeks until moving into the house they now occupy. Money observed several visits between parents and the children and recalled how Johnny would appear to stay by himself, isolated and ignored. Usually some problem would occur with one of the younger children, such as Anthony choking after eating too many donuts or Catherine spilling an overfilled cup of drink on herself.

Although Money referred father and mother "to family counseling at Commonwealth Catholic Charities," the parents decided to meet with Robert Osborn for counseling. Initially, Osborn told Money he did not believe the parents could cope with children with special needs. However, according to Money, he later altered that opinion and currently feels the parents could maintain the children in their home "as long as there were a lot of supportive services in the home."

Sharon Jacobs has been the foster mother for Christina, Catherine and Anthony since December 3, 2001. Jacobs explained how she and her husband were able to successfully alter the

-

children's behavior by establishing a system of rules and rewards. Jacobs noted that the children appear happier and more responsive. She attributes their progress to the daily routine and structure she and her husband offer in their therapeutic foster home setting. There have been no incidents of biting since the placement.

Robert Osborn, a licensed clinical social worker, testified that he first met with the parents in October 2001 and has been seeing them weekly. Initially, both parents exhibited symptoms of "affective disorders," mother suffering from depression and father from bipolar disorder. Both parents are currently taking antidepressants, and their conditions are stabilized. Although Osborn was not concerned about the children's safety if they returned home, he felt "there's still room for growth in their parenting skills." Osborn opined they may pay less attention to the children's emotional needs and show inconsistency in their care. According to Osborn, the parents have made much progress since their first meeting in October 2001. He acknowledged that the parents failed to advise him they had psychological evaluations done in May 2000 and that access to those results would have been helpful in their treatment. Osborn felt the parents might be able to be more effective with the children in terms of incorporating what they have learned if they were able to practice what they have learned for three or four months. Osborn noted that children with ADHD need "consistency,

support," medication, and structure. According to Osborn, the parents would need two to three months "to get back into the swing of parenting and be able to incorporate [their] new information." Osborn noted that both parents came from dysfunctional family situations, making it more difficult for them to overcome their past and become effective parents.

By order dated February 28, 2002, the trial court deferred making a determination "until early August 2002" in order to allow the parents, who had recently been diagnosed and prescribed medication and therapy, to show that they could effectively remedy the situation causing removal and take care of their children. The trial court directed RDSS to "provide appropriate services to determine if reunification of this family can be accomplished" and to "file a report of its efforts and any reaction thereto and results thereof" before the August hearing.

### RDSS's Report of Reunification Attempt

Pursuant to the trial court's February 28, 2002 order, Money prepared and submitted a report "documenting the efforts made by [RDSS] to attempt to reunify" the parents with the children. Money first changed the one and one-half hour bi-weekly supervised visits to unsupervised visits. The visits took place in a playroom at the RDSS office; a two-way mirror enabled RDSS staff to observe. If, during those visits, the parents "could demonstrate that they could keep the children

-

safe, . . . then the visits could begin to take place at the Van Buren's home."

By April 2002, visitation took place weekly and was increased to two hours.  In May 2002, "the visits were changed back from weekly to bi-weekly, as [the three younger children's] behavior had declined dramatically, and Mr. and Mrs. Van Buren were not demonstrating appropriate parenting skills."  "On many occasions," Money observed situations where the parents "have not been able to keep the children safe, supervise them, or discipline them appropriately."  For example, "[d]uring unsupervised visits, Anthony has bitten his siblings on several occasions and he has fallen off the back of the couch and bumped and scratched his head."  Moreover, father "has been observed spitting on the children, and walking out in traffic while holding Christine and Katherine's hands."  Money noted that father "does not follow the instructions that [she] makes regarding the visits, [and] he spends little time actually interacting with the children, as he uses the telephone, leaves the room to smoke cigarettes, or" complains about the children's foster care case.  Money detailed several inappropriate comments made to the children by mother and father and noted that mother "has not shown any ability to discipline the children."  It "appear[ed]" to Money that the parents "rely on Johnny [the oldest child] to discipline his younger siblings."  The parents bring no toys or games with which to engage the children during

-

the visits, instead promising them there will be toys when they return home.

Money wrote that father "will not accept redirection, or he will deny that he responded in a particular way." For example, he "attempted to schedule visits with Johnny through the foster mother, rather than scheduling them through [Money]." When confronted with the issue, he denied making such a request to the foster mother. Another time, father "went against [Money's] recommendations and allowed" the mother, who had a suspended driver's license, to transport Johnny and him to an event in the city. Money documented other instances in which father acted against her advice and "attempted to deceive [her]."

Money reported that Anthony, Catherine and Christina's "foster parents . . . have noticed a decline in the children's behavior since the visits have been unsupervised." Following the visits, "the children are much more aggressive" and they experience nightmares. Christina "wets the bed for several nights following visits" and has "temper tantrums." After one visit at which father spit water on the children, "the children were spitting on one another." Following a visit on May 22, 2002, Anthony's foster mother noted "6 small bruises on his back." Anthony said "that Johnny had touched his back" and that "he had bitten" Johnny and his mother because they "were holding him tightly." Money observed several situations where the parents failed to properly discipline or supervise the children,

-

either ignoring the behavior or merely saying, "No," often to no avail, but refusing to actively address the situation.

Money spoke with Debra Robbins, the therapist for the three younger children, and reported Robbins' opinion that father "would not be able to attend the children's needs, due to his own limitations."

### The Second Hearing

On August 7, 2002, the parties appeared before the trial court. Prior to the hearing, Money submitted her report. Four witnesses testified, including Osborn, the clinical social worker working with the parents. The evidence established that father suffers from bipolar disorder, an "emotional disorder," and mother suffers from depression. Osborn noted that these "chronic conditions" can be treated in the long-term only if the parents regularly obtain and take their medication.

The guardian ad litem for Johnny, the oldest child, advised the trial court that Johnny's "connection is very strong with the [three younger] siblings," and that connection is "clearly the stronger one." Johnny lives with different foster parents than the three siblings. Johnny's guardian ad litem reported that Johnny expressed that he did not desire to return home if his siblings did not return. The guardian noted that Johnny's connection with his siblings would be cut off completely if Johnny remained at home alone with the parents and the parental rights to the younger siblings were terminated and they were

-

adopted.  However, if Johnny remains in another foster home or is adopted by another family, there is a possibility that visitation among the siblings could be arranged.

In light of Money's report documenting the parents' inability to safely care for the younger three children in a controlled setting for a short period of time, and because they are doing so well in their foster home, the younger children's guardian ad litem recommended that "it's in their best interest to end this and move forward with the adoption."

The trial court ruled as follows:

> I do find by the appropriate standard clear and convincing evidence that it is appropriate that there be termination of parental rights of all four children.  I have no question in my mind whatsoever about the appropriateness of that decision, with the exception of Johnny.
>
> That one, I think Mr. Yeaker [Johnny's guardian ad litem] has set out at least three of the most obvious options.  There's not one of them in that whole group that is a great one.  I think the best one and the most likely to result in a long-term benefit for [Johnny] is going to be terminate and attempt to get him into an adoptive home. That needs to be done soon.  He's eleven years old now.  Time is running out for him.

The trial court directed the attorney for RDSS to draft an order reflecting his ruling.

The final order dated September 3, 2002, contains the following:

> The Court having heard and considered the evidence and arguments of counsel FINDS

-

by a preponderance of the evidence that the goal of adoption is in the best interests of [the children]. The Court also FINDS by clear and convincing evidence that it is in the best interests of [the children] to terminate the parental rights of Michael and Cassie Van Buren and that Michael and Cassie Van Buren have failed to remedy the conditions, which led to [the children's] placement and continuation in the custody of the Richmond Department of Social Services.

Therefore the Court ORDERS that the residual parental rights of Michael and Cassie Van Buren are terminated, the goal of adoption is approved and the Richmond Department of social Services is granted the rights to place the child[ren] for adoption.

## ANALYSIS

"When addressing matters concerning a child, including the termination of a parent's residual parental rights, the paramount consideration of a trial court is the child's best interests." Logan v. Fairfax County Dep't of Human Development, 13 Va. App. 123, 128, 409 S.E.2d 460, 463 (1991). "'In matters of a child's welfare, trial courts are vested with broad discretion in making the decisions necessary to guard and to foster a child's best interests.'" Id. The trial judge's findings, "'when based on evidence heard ore tenus, will not be disturbed on appeal unless plainly wrong or without evidence to support it.'" Id. (citation omitted).

### Sufficiency of the Evidence

Appellant contends the evidence was insufficient to support the termination under either subsection of Code § 16.1-283(C).

-

The trial court never entered an order terminating father's rights to his stepson, Johnny Collins, therefore, there is nothing for father to appeal in regards to Johnny. See supra note 2 (dismissing appeal in Record No. 2620-02-2).

As to the termination of father's parental rights to his three younger children, although the trial court did not specifically state under which subsection of the statute it found termination of appellant's parental rights to be appropriate, RDSS's evidence and the language used by the trial court make clear that the termination occurred pursuant to Code § 16.1-283(C)(2). Thus, we limit our sufficiency analysis to Code § 16.1-283(C)(2), which provides that a court may terminate a parent's residual parental rights where a child has been placed in foster care as a result of court commitment if the court finds, based upon clear and convincing evidence, that (1) it is in the best interests of the child; (2) that the parents without good cause have been unwilling or unable within a reasonable period of time not to exceed twelve months to remedy substantially the conditions which led to the child's foster care placement; and (3) that reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies have been made to such end.

Clear and convincing evidence is "that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be

-

established.  It is intermediate, being more than a mere preponderance, but . . . [less than] a reasonable doubt . . . ." Gifford v. Dennis, 230 Va. 193, 198 n.1, 353 S.E.2d 371, 373 n.1 (1985).

We view the evidence in the light most favorable to the party prevailing below and grant to that evidence all reasonable inferences fairly deducible therefrom.  Logan v. Fairfax County Dep't of Human Dev., 13 Va. App. 123, 128, 409 S.E.2d 460, 463 (1991).  Although "[t]he termination of residual parental rights is a grave, drastic and irreversible action," Helen W. v. Fairfax County Dep't of Human Dev., 12 Va. App. 877, 883, 407 S.E.2d 25, 28-29 (1991), we "'presume[] [the trial court has] thoroughly weighed all the evidence [and] considered the statutory requirements,'" Logan, 13 Va. App. at 128, 409 S.E.2d at 463 (quoting Farley v. Farley, 9 Va. App. 326, 329, 387 S.E.2d 794, 796 (1990)).

The evidence, viewed in the light most favorable to RDSS, proved, by clear and convincing evidence, both (1) that RDSS made "reasonable and appropriate efforts" to help father remedy the conditions "which led to or required continuation of the child[ren]'s foster care placement" and (2) that appellant, without good cause, failed "to substantially remedy" those conditions.  In reaching this conclusion, the court was required by Code § 16.1-283(C)(2) to "take into consideration the prior efforts of such agencies to rehabilitate the parent."

-

The evidence established that RDSS began working with father and mother in July 1999 after it obtained custody of the children. RDSS submitted a foster care plan with a goal of returning the children home, first by March 2000, then by December 2000. During the children's temporary placement in foster care, RDSS assisted mother and father in obtaining help so as to improve their parenting skills and regain possession of their children. The case worker referred mother to a parents support group and father to agencies to evaluate and treat him for substance abuse and anger management. In April 2000, RDSS contracted with Wilkerson's to provide in-home assistance, and in May 2000, RDSS had mother and father evaluated by a psychologist. The evaluation revealed that father has below average cognitive abilities, he is emotionally immature, and he may suffer from neurological impairment, alcohol dependence, and depression. The evaluation recommended a psychiatric evaluation for possible medical intervention. The evaluation found father to be rigid, simplistic, and limited in solving problems.

Eleven months after removing the children and providing services to help the parents be more effective and diligent, RDSS returned the children to the parents for a trial placement. Five months later, in November 2000, RDSS again removed the children based on a founded complaint of lack of supervision and deteriorating behavior by the children, which the parents were

-

unable to control or ameliorate.  The children were again placed in foster care homes.

The children had spent eleven months in foster care during the first removal and another twenty months after the second removal.  During that thirty-one month period, three different case workers worked on the case.  Throughout that period, RDSS provided services and referrals and made "reasonable and appropriate efforts" to help the parents remedy the conditions which both "led to" and "required continuation of" the children's foster care placement in 1999 and 2000.

By the time of the February 2002 hearing, the parents, Anthony and Christina had been diagnosed and were taking daily medication to manage their respective conditions.  Therefore, the trial court directed RDSS to attempt to reunify the family a third time and determine if they could parent the children effectively and safely now that Anthony, Christina, father and mother were being treated.  RDSS tried to expand visitation in hopes of reunifying the parents and the children; however, the case worker reported several instances in which father and mother acted inappropriately, failed to maintain control of the children, and/or demonstrated an inability to keep them safe.

The record established that RDSS provided services and resources for an extended period of time, well over the twelve-month period.  Despite those services, father and mother failed to make reasonable progress towards eliminating

-

substantially the conditions which led to the children's foster care placement.  See Code § 16.1-283(C)(2).

"'It is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his [or her] responsibilities.'"  Richmond Dept. of Soc. Servs. v. L.P., 35 Va. App. 573, 584, 546 S.E.2d 749, 754-55 (2001) (quoting Kaywood v. Halifax County Dep't of Soc. Servs., 10 Va. App. 535, 540, 394 S.E.2d 492, 495 (1990)).

> Waiting indefinitely to find out if the [parents] might someday remedy the conditions that resulted in [the children's] foster care placement only prolongs the lack of stability and permanency in [the children's] li[ves], with no guarantee or even reasonable likelihood that the [parents] will ever be able to adequately care for [the children] in the future."

Id. at 585, 546 S.E.2d at 755.

Moreover,

> a parent's mental deficiency that is of such severity that there is no reasonable expectation that such parent will be able within a reasonable period of time befitting the child's best interests to undertake responsibility for the care needed by the child in accordance with the child's age and stage of development does not constitute "good cause" under Code § 16.1-283(C)(2).

Id.

The children are doing well, living with foster families who love them and provide safe, clean environments and appropriate supervision.  That situation contrasts sharply with

-

the chaotic and unclean conditions they repeatedly experienced with the parents.  Being ADHD, Anthony and Christina require care and supervision that father and mother cannot now provide. RDSS presented clear and convincing evidence that termination is in the children's best interests and it is not reasonably likely that the conditions which led to the children's neglect or abuse can be substantially corrected or eliminated to allow them to return within a reasonable period of time.

Standard of Proof

Father contends the trial court based its findings on an incorrect standard.  He bases his argument on a statement in RDSS's closing argument and on language used in the draft of the final order prepared by RDSS.

At the August 2002 hearing, counsel for RDSS summarized Code § 16.1-283(C)(2) as allowing termination if parents are "unwilling or unable within any reasonable period of time not to exceed 12 months . . . to remedy the situation."  The final order, which the trial court directed RDSS to prepare, states that the trial court found by clear and convincing evidence that the parents "have failed to remedy the conditions" which led to removal and placement by RDSS.

On appeal, father points out that RDSS misstated the law in its closing argument and in its draft of the final order in that the statute requires a showing that a parent need only "remedy substantially," not remedy completely, "the conditions which led

-

to or required continuation of the child's foster care placement."  Code § 16.1-283(C)(2) (emphasis added).

Father failed to raise before the trial court the argument he makes here.  Rule 5A:18 provides, in pertinent part, that "[n]o ruling of the trial court . . . will be considered as a basis for reversal unless the objection was stated together with the grounds therefor at the time of the ruling."  Thus, we will not consider a claim of trial court error as a ground for reversal "where no timely objection was made."  Marshall v. Commonwealth, 26 Va. App. 627, 636, 496 S.E.2d 120, 125 (1998).  The purpose of these rules is to ensure that the trial court and opposing party are given the opportunity to intelligently address, examine, and resolve issues in the trial court, thus avoiding unnecessary appeals and reversals.  Lee v. Lee, 12 Va. App. 512, 514, 404 S.E.2d 736, 737 (1991) (en banc).

Father acknowledges that he did not preserve these issues but asks us to invoke the "ends of justice" exception to Rule 5A:18 in order to consider the merits of his claims.  "[T]he ends of justice exception is narrow and is to be used sparingly . . . ."  Brown v. Commonwealth, 8 Va. App. 126, 132, 380 S.E.2d 8, 10 (1989).  "In order to avail oneself of the exception, a [party] must affirmatively show that a miscarriage of justice has occurred, not that a miscarriage might have occurred."  Redman v. Commonwealth, 25 Va. App. 215, 221, 487 S.E.2d 269,

-

272 (1997).  The trial error must be "clear, substantial and material."  Brown, 8 Va. App. at 132, 380 S.E.2d at 11.

In expressing its decision, the trial court found "by the appropriate standard clear and convincing evidence" to support its decision to terminate father's residual parental rights. Moreover, we found in the previous discussion that RDSS presented clear and convincing evidence to support the trial court's decision.  That evidence proved that the parents failed to remedy substantially the conditions that caused the children to be removed and placed with RDSS.  Specifically, the evidence established that, after more than two and one-half years of RDSS assistance, the parents were unable to safely and appropriately supervise the children and take care of their special needs. Therefore, the record does not reflect any reason to invoke the good cause or ends of justice exceptions to Rule 5A:18.

Accordingly, the decisions of the circuit court with regard to Catherine, Christina and Anthony are summarily affirmed.

Record No. 2618-02-2, affirmed.
Record No. 2619-02-2, affirmed.
Record No. 2621-02-2, affirmed.
Record No. 2620-02-2, dismissed.