COURT OF APPEALS OF VIRGINIA


Present: Judges Frank, McClanahan and Senior Judge Willis


MISTY RATCLIFF

MEMORANDUM OPINION[*]

v.      Record No. 0462-06-3                           PER CURIAM
                                                       SEPTEMBER 26, 2006

DICKENSON COUNTY DEPARTMENT
 OF SOCIAL SERVICES


FROM THE CIRCUIT COURT OF DICKENSON COUNTY
Henry A. Vanover, Judge

(Freddie E. Mullins, on brief), for appellant.

(Gerald L. Gray; Brian K. Patton; Buddy H. Wallen, Guardian *ad
litem* for the minor children; Gerald Gray Law Firm, P.C., on brief),
for appellee.


        Misty Ratcliff ("mother") contends the trial court erred in terminating her parental rights

to her two minor children, J. and T. She argues the evidence was insufficient to support the trial

court's decision, which she claims was based upon Code § 16.1-283(B). While the trial court's

opinion letter cites and quotes Code § 16.1-283(B), its decision is not based upon that section.

The original petition for termination was brought under Code § 16.1-283(C)(2). The trial court's

order tracked the language of Code § 16.1-283(C)(2). Appellant's noted objection to the order

asserted that the evidence failed to satisfy Code § 16.1-283(C)(2) and made no mention of Code

§ 16.1-283(B). Thus, we consider only whether the evidence satisfied Code § 16.1-283(C)(2).

Because the trial court's decision is plainly supported by the evidence, we hold that this appeal is

without merit and we affirm summarily. See Rule 5A:27.

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

BACKGROUND

We view the evidence in the light most favorable to the prevailing party below and grant to it all reasonable inferences fairly deducible therefrom. See Logan v. Fairfax County Dep't of Human Dev., 13 Va. App. 123, 128, 409 S.E.2d 460, 462 (1991). So viewed, the evidence proved that on March 18, 2004, social workers Beth Stanley and Tracy Mullins responded to a call that J. was in the emergency room with suspicious bruises. Mother informed them her husband "was rough with the children and that was likely to have caused some of the bruises." J., then four years old, was dirty and was not wearing any underwear. Her brother T., three years old, had come to the hospital with mother; he was not wearing a diaper, and his pants were saturated with urine. According to Stanley, T. was literally "doing tumbles all over the floor." Both children were taken into custody through an emergency removal order.

At the time of the removal, the Dickenson County Department of Social Services ("DSS") had been providing services[1] to mother and her husband for over three years. While mother complied with the services, Stanley noted that "progress was not made to the point where it remedied the problem." Both children were developmentally delayed, and by the time of their removal, Stanley noted they "had developed . . . a great deal of needs . . . . [T]hey both were basically just wild animals."

On March 24, 2004, the juvenile and domestic relations district court entered an order whereby all parties agreed that removal was in the children's best interests, and set a hearing date

---

[1] Stanley noted that "[w]e had received numerous complaints and the services were initiated based on those complaints." DSS assisted the family in cleaning their home, paid electric bills, and helped them with car repairs. It also provided two in-home programs. The first, Family Preservation Intensive In-Home services, went into the mother's home twice, even though it was "designed to go [into the home] one time." The second, Community Services In-Home Parenting Program, was set up to assist parents for eight weeks, but it continued for twelve months "due to [a] lack of consistency with the parents." Finally, DSS arranged to have J. evaluated for issues related to her aggression and acting out sexually, even providing transportation to the Kluge Center in Charlottesville.

of April 28, 2004, on the allegations of abuse and neglect. The order included an addendum specifying seven requirements to be fulfilled by mother and her husband.[2] The requirements included, among other things, submission to a psychological evaluation and attending parenting classes. Mother and father were to maintain their home in a clean and appropriate manner, and remove all animals.[3] It also required father to obtain full-time employment.

On April 5, 2004, mother underwent a psychological examination by Dr. Nancy L. Lanthorn. Dr. Lanthorn found mother had an IQ of 52. Her math skills were on a second grade level, and her reading abilities on a fourth grade level. Dr. Lanthorn concluded mother's "cognitive limitations and low mental age [prohibited] her ability to parent [her] children adequately . . . ." She also opined that the special services provided by the children's school and social services had had little impact upon mother because she "[was] not intellectually capable of making good decisions for their well-being." According to Dr. Lanthorn's assessment,

> Ms. Ratcliff has little support from her husband. She is left to manage on her own, which she cannot do. She would not be capable of self-support or single parenting. In a sense that is what she has been attempting to do and the records reflect it isn't working out.

On April 28, 2004, an agreed order was entered by the juvenile court finding no abuse and neglect, but continuing the children's placement in foster care. Visitation was increased, but no goals were established for the return of the children.

DSS received the psychological assessments in the fall of 2004. Stanley testified that the assessments provided DSS with "a better understanding . . . [of] what we were dealing with. . . . [W]e had it in black and white that . . . the father had no motivation to improve and . . . the

---

[2] As the record contains no transcript of the March 24th hearing, it is unclear whether these conditions were a prerequisite to the subsequent dismissal of the abuse and neglect charges or to the return of the children.

[3] DSS records indicated there was "animal feces throughout the home."

mother just wasn't mentally capable." Although Stanley admitted that mother complied with all of the requirements imposed by the March 24th order, and accepted all services offered by DSS, DSS changed its goal from return home to adoption on November 4, 2004.[4]

At the time of removal, T. was three years old and did not speak. J. was four years old and enrolled in a pre-kindergarten handicapped program following several failed attempts to place her in other schools. She exhibited aggressive and inappropriate sexual behavior. Her verbal communication skills consisted of "grunting," and she was unable to eat with a fork. An aide to her pre-kindergarten teacher, Rhonda Posten, testified that J. came to school dirty and that "[h]er odor was so bad you couldn't stand it." Posten stated that she helped J. shower at school on at least ten occasions.

Within six months of J.'s foster care placement, Stanley observed a "big improvement in her speech . . . [y]ou [could] understand her. She [could] talk in complete sentences." Furthermore, her aggressive behavior had "drastically reduced," and she was "doing great" in a mainstream kindergarten class, where for the first time "she [was] able to maintain in the classroom without having to be removed." According to Stanley, both children "[went] from literally wild animals to wonderful, well behaved, and mannered, and clean, and developing children."

Posten echoed Stanley's observations. She testified that J. "is just a different child . . . . She will come to you and tell you that she loves you. And before . . . that would never happen."

---

[4] Stanley noted that J. "seem[ed] to have no emotional attachment to her parents." In fact, J. resisted visitation with mother and became "very upset" if her foster mother attempted to leave during the visits. Ultimately, DSS was forced to terminate the visitation due to its negative impact on J.'s behavior at school and in her foster home.

ANALYSIS

When addressing matters concerning a child, including the termination of a parent's residual parental rights, the paramount consideration of a trial court is the child's best interests. See Toombs v. Lynchburg Div. Of Soc. Servs., 223 Va. 225, 230, 288 S.E.2d 405, 407-08 (1982); Farley v. Farley, 9 Va. App. 326, 329, 387 S.E.2d 794, 796 (1990). On review, "[a] trial court is presumed to have thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests." Farley, 9 Va. App. at 329, 387 S.E.2d at 796. Furthermore, the evidence is viewed in the light most favorable to the prevailing party below and its evidence is afforded all reasonable inferences fairly deducible therefrom. Id. at 328, 387 S.E.2d at 795. "[W]e will not disturb the trial judge's finding unless it is 'plainly wrong or without evidence to support it.'" Richmond Dep't of Soc. Servs. v. Crawley, 47 Va. App. 572, 580, 625 S.E.2d 670, 674 (2006) (quoting M.G. v. Albemarle County Dep't of Soc. Servs., 41 Va. App. 170, 181, 583 S.E.2d 761, 766 (2003)).

Mother argues the trial court erred in terminating her parental rights because DSS "failed to show, by clear and convincing evidence, that [she] had been unwilling or unable to remedy the conditions which led to or required the continuation of the child's foster care placement." Mother argues that, on the contrary, the evidence established that she "remedied the conditions which led to foster care placement."

Code § 16.1-283(C)(2) states as follows:

> The residual parental rights of a parent or parents of a child placed in foster care as a result of court commitment, an entrustment agreement entered into by the parent or parents or other voluntary relinquishment by the parent or parents may be terminated if the court finds, based upon clear and convincing evidence, that it is in the best interests of the child and that:

> \*     \*     \*     \*     \*     \*     \*

- 5 -

*The parent or parents, without good cause, have been unwilling or unable within a reasonable period of time not to exceed twelve months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end.* Proof that the parent or parents, without good cause, have failed or been unable to make substantial progress towards elimination of the conditions which led to or required continuation of the child's foster care placement in accordance with their obligations under and within the time limits or goals set forth in a foster care plan filed with the court or any other plan jointly designed and agreed to by the parent or parents and a public or private social, medical, mental health or other rehabilitative agency shall constitute prima facie evidence of this condition. The court shall take into consideration the prior efforts of such agencies to rehabilitate the parent or parents prior to the placement of the child in foster care.

(Emphasis added.)

The trial court found that DSS

offered services to the parents above and beyond the usual assistance, to assist these parents for a period of three (3) years prior to the removal of the children, to no avail. . . . The parents have been unable to remedy substantially the conditions which led to the children's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health, or other rehabilitation agencies to such end.

Based upon the evidence before it, the trial court's decision was not plainly wrong. While mother cooperated with DSS and took advantage of the services offered for over three years, she was unable to remedy her parenting problems. As the psychological evaluation revealed, the offered services did not provide a solution because mother lacked the mental capacity to assimilate them by herself, and her husband was unwilling to provide her the support she required.

"[W]hen considering a termination of parental rights, 'the child's best interest[5] is the paramount concern.'" Crawley, 47 Va. App. at 579,625 S.E.2d at 673 (quoting Wright v. Alexandria Div. of Soc. Servs., 16 Va. App. 821, 827, 433 S.E.2d 500, 503 (1993)) (footnote added). "'[I]t is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming . . . responsibilities.'" Lecky v. Reed, 20 Va. App. 306, 312, 456 S.E.2d 538, 540 (1995) (alteration in original) (quoting Kaywood v. Halifax County Dep't of Soc. Servs., 10 Va. App. 535, 540, 394 S.E.2d 492, 495 (1995)). Furthermore, a parent's inability to remedy the conditions which led to the child's placement is not excused where the

> parent's mental deficiency that is of such severity that there is no reasonable expectation that such parent will be able within a reasonable period of time befitting the child's best interests to undertake responsibility for the care needed by the child in accordance with the child's age and stage of development.

Richmond Dep't of Soc. Servs. v. L.P., 35 Va. App. 573, 585, 546 S.E.2d 749, 755 (2001) (mental deficiency does not constitute "good cause" under Code § 16.1-283(C)(2)).

"[In Lecky] we ordered termination of the mother's parental rights partially because the record did not suggest 'that the mere passage of time would resolve her difficulties.'" Crawley, 47 Va. App. at 581-82, 625 S.E.2d at 674-75 (quoting Lecky, 20 Va. App. at 312, 456 S.E.2d at 541). We also noted the mother and child were "emotionally distanced." Lecky, 20 Va. App. at 309, 456 S.E.2d at 539.

As in Lecky, "[n]othing in this record . . . suggests that the mere passage of time would resolve [mother's] difficulties." Id. at 313, 456 S.E.2d at 541. "[F]urther delay would prolong [the children's] familial instability without the promise of benefit to [them], a result clearly contrary to the child's best interests." Id. Cf. L.G. v. Amherst County Dep't of Soc. Servs., 41

---

[5] Mother does not argue that termination is not in the best interests of the children.

Va. App. 51, 581 S.E.2d 886 (2003) (mother possessed innate ability to improve her parenting skills, albeit beyond the twelve-month period contemplated by the statute). The evidence showed that J. lacked a bond with her mother, and even resisted visitation with her. It also proved, through the testimony of the social worker and J.'s teachers, that J.'s conduct and well-being had dramatically improved since her placement in foster care. As Stanley phrased it, both J. and T. evolved from "literally wild animals to wonderful, well behaved . . . children."

Clear and convincing evidence proved that the mother's mental capacity rendered her unable to remedy the conditions that led to the children's being placed in foster care. Notwithstanding the trial court, in its letter opinion, cited and quoted Code § 16.1-283(B), its order was pursuant to Code § 16.1-283(C)(2) and was plainly supported by the evidence. Accordingly, we affirm the judgment of the trial court.

<u>Affirmed.</u>