COURT OF APPEALS OF VIRGINIA

Present:   Judges Petty, Beales and Athey
Argued at Lexington, Virginia


CARRIE PILENZA

                                                    MEMORANDUM OPINION* BY
v.        Record No. 0034-19-3                      JUDGE CLIFFORD L. ATHEY, JR.
                                                    MARCH 17, 2020

NELSON COUNTY DEPARTMENT OF
 SOCIAL SERVICES

                FROM THE CIRCUIT COURT OF NELSON COUNTY
                          Michael T. Garrett, Judge

          Peter S. Frazier for appellant.

          P. Scott De Bruin; Herbert E. Taylor, III, Guardian *ad litem* for the
          minor child (The Law Offices of Herbert E. Taylor, III, PLLC, on
          brief), for appellee.[1]


          Carrie Pilenza ("mother") appeals a determination by the Circuit Court of Nelson County

("circuit court") terminating her parental rights and placing her daughter, C.P.,[2] with Nelson

County Department of Social Services ("NCDSS").  Mother presents two assignments of error

on appeal.  First, she argues that "[u]nder Spencer v. Commonwealth, 240 Va. 78 (1990) and

related jurisprudence, the [circuit] court erred by admitting expert testimony from two

psychologists whose opinions stemmed from their use of unreliable, unscientific, and outmoded

          * Pursuant to Code § 17.1-413, this opinion is not designated for publication.

          [1] Pursuant to Rule 5A:19(d), the guardian *ad litem* filed a notice relying on appellee's
brief and argued in support of appellee's position.

          [2] To protect the child's privacy, we use her initials rather than her name.  Additionally,
the record in this case was sealed.  In order to appropriately address the assignments of error
mother raises, this opinion includes portions of the record that were sealed.  "To the extent that
this opinion mentions facts found in the sealed record, we unseal only those specific facts,
finding them relevant to the decision in this case.  The remainder of the previously sealed record
remains sealed."  Levick v. MacDougall, 294 Va. 283, 288 n.1 (2017).

testing methods." Mother also contends that the circuit court erred under Code § 16.1-283 "by terminating [her] parental rights without clear and convincing evidence that she failed to substantially remedy the circumstances resulting in the child's abuse, neglect, and/or continued commitment to foster care." Upon reviewing the record and briefs of the parties, we conclude that the circuit court did not err. Accordingly, we affirm the decision of the circuit court.

I. BACKGROUND[3]

On June 7, 2017, C.P. came into the care and custody of NCDSS pursuant to an emergency removal petition. On February 20, 2018, NCDSS sought to terminate the residual parental rights of mother and C.P.'s father ("father").[4] Mother had been hospitalized for mental illness, and father had been incarcerated for eluding police and endangering the life of C.P., who was in the vehicle father was driving when he was arrested for eluding the police.

The Nelson County Juvenile and Domestic Relations District Court ("JDR court") heard the matter on August 27, 2018. Because both mother and father were absent, the JDR court adjudicated C.P. as abused or neglected and indicated that its finding was based upon C.P. being "without parental care or guardianship caused by the unreasonable absence or the mental or physical incapacity of the child's parent, guardian, legal custodian or other person standing *in loco parentis*." Pursuant to the JDR court's order, C.P. remained in the care of NCDSS, and both mother and father appealed the JDR court's determination for a *de novo* trial in the circuit court.

---

[3] Pursuant to familiar appellate principles, we review the evidence on appeal "in the light most favorable to the prevailing party below," here, NCDSS. Logan v. Fairfax Cty. Dep't of Human Dev., 13 Va. App. 123, 128 (1991).

[4] This is a companion case of Christopher Pilenza v. Nelson Cty. Dep't of Soc. Servs., __ Va. App. __ (2020), also decided this day.

On November 26, 2018, during the *de novo* hearing, mother testified that she and father married in 2015 and that she knew that father had been previously convicted of felony murder. C.P. was the first child born of the marriage on December 18, 2016.

She further testified that on May 21, 2017, the couple had an argument at their home regarding mother placing C.P. in a moldy bassinet. At some point, father placed C.P. into his vehicle and drove toward the UVA health center in Charlottesville to obtain a medical evaluation for C.P. Mother became concerned, among other things, about the six-month-old child not being in an infant safety seat. Mother then contacted the police, and they pursued father's vehicle, which only stopped after police were forced to ram it.

As a result, police charged father with two felonies—eluding police under Code § 46.2-817(B) and endangering the life of a child under Code § 40.1-103. Although C.P. had not been harmed, upon the child's return to mother, NCDSS asked mother to sign a safety plan with the agency, which mother agreed to do.

Mother had a previous history of panic attacks, anxiety, and postpartum depression. In fact, on June 7, 2017, mother sought emergency mental health treatment from her primary care provider, reporting increasing symptoms of postpartum depression and anxiety, along with (1) abnormal thoughts, (2) struggling to take care of her mental health while caring for C.P. alone, and (3) having difficulty coping with the stress from father's recent incarceration. Specifically, mother had been experiencing thoughts of suicide and thoughts of spanking C.P. when C.P. would awaken at night crying.

As a result, mother voluntarily sought inpatient psychiatric treatment, and NCDSS removed C.P. from her custody and care. Mother was subsequently diagnosed with depression and generalized anxiety. Upon discharge, mother was instructed to continue outpatient therapy. As a part of her outpatient therapy, mother regularly attended supervised visitation with C.P.

NCDSS recommended, and mother also regularly attended, a clinical program called "Raising Our Children," where she received training in making better parenting decisions and appropriately meeting C.P.'s needs.

During the program, clinician Teresa Bouthillier ("Bouthillier") observed mother "not being able to pick up on verbal cues by C.P." and "not thinking about things like changing her diaper or making sure her sippy cup was in her diaper bag." She explained that mother seemed to comprehend the concepts when she learned them, but that once they moved on to a new concept, mother would lose concepts she had focused on before. Mother also had difficulty conceptualizing developmental expectations on a day-to-day basis.

Mother only "minimally improved," and her inability to make sound decisions and recognize dangerous situations remained. For instance, mother decided to place C.P.'s crib below shelves containing heavy objects and chose to live with others who had prior criminal charges. In addition, mother still planned to reconcile with father.

Kelsey Summers ("Summers") also testified on behalf of NCDSS. She shared Bouthillier's concerns, having observed approximately sixty visitations between mother and C.P. She testified that mother still needed to be reminded to change C.P.'s diaper or feed her a bottle. She recalled one visitation in which mother had prepared a bottle for C.P. that was too hot. She recalled another incident in which mother did not react quickly to C.P. choking on a sandwich and had to be shown how to perform a mouth sweep.

Summers was also concerned that mother chose to live with Thomas Kenyon, who had a "criminal record," including an assault and battery charge. Summers also described the room mother rented as being within a home filled with clutter and with pictures hanging from floor to ceiling that Summers feared C.P. might grab and hurt herself. Summers testified that she and

others from NCDSS had to point out safety concerns like this to mother constantly; it concerned Summers that mother failed to recognize these dangers.

Summers also questioned mother's judgment when mother moved in with her boyfriend, Matthew Coates ("Coates"), without investigating his background, especially when she had only known him for "approximately two to three weeks." Summers also expressed concerns related to the age and condition of the new apartment and elevation changes within it, which included stairs and varying flooring heights. Summers cited several other potentially dangerous conditions in the apartment, including (1) pipes for water or gas running along some walls that could be moved up or down, (2) a frayed wire behind the bedroom door that C.P. could grab, (3) the presence of radiators in each room, and (4) the presence of choking hazards on the floor, such as screws.

Summers also testified that mother had failed to make any substantial progress in addressing the mental health issues that contributed to her inability to recognize dangerous conditions and poor judgment in meeting C.P.'s needs. Finally, Summers testified that C.P. was living in a prospective adoptive home and "doing well" there. C.P. had "bonded with" her foster parents, foster siblings, and J.P., her biological sibling.

Mary Rice ("Rice") was providing counseling to mother when the *de novo* trial began. Rice, a licensed professional counselor and expert in the fields of counseling and parent coaching,[5] also characterized any improvement she saw in mother as minimal. Rice further characterized mother's parenting ability as "very limited" based upon, among other deficiencies, that mother neither fed C.P. nor changed her diaper during visitations.

---

[5] Mother stipulated that Rice was an expert in the fields of counseling and parent coaching at the November 26, 2018 termination hearing before the circuit court.

Although Rice believed that she wanted to "be a good mom and want[ed] to do well," mother struggled in attempting to make that happen. Accordingly, Rice testified that she could not endorse C.P. returning home to mother and was uncertain when she would be ready to care for C.P.

Nina Dillon ("Dillon"), a licensed professional counselor, testified to a theme based upon her observations in which mother "needed prompting regarding basic parenting skills" where mother acted—or failed to act—in some way that required "correcting." Dillon cited concern about mother's difficulty in regulating her emotions and concerns for C.P.'s safety because mother did not notice things such as pulling up on a chair or "wandering away" at the playground. Dillon was especially concerned with mother's inability to keep an eye on both of her children simultaneously.

Christina Campbell ("Campbell"), a Court Appointed Special Advocate ("CASA") volunteer who had contact with mother about once a week, also corroborated the testimony of the other NCDSS witnesses.

Dr. Marilyn Minrath ("Minrath"), a clinical psychologist, testified to completing two mental health evaluations on mother. She testified that mother did not understand childhood development, did not possess parental instinct, and suffered from mental health issues serious enough to warrant "intensive individual psychotherapy" to address mother's "underlying psychological problem" associated with her "developmental trauma" and "persistent depression."

Minrath also opined that mother presented a high risk of harm to C.P. based upon her prior abnormal thoughts of spanking C.P. and recommended that C.P. not return home to mother, estimating that mother might need one to two years of treatment before she would be prepared for C.P.'s return.

Mother moved to strike this expert "scientific" testimony because there had been no finding of reliability. The circuit court overruled her objection because she failed to make a contemporaneous objection.

Dr. A.J. Anderson ("Anderson") completed personality, intelligence, parenting, and mental health evaluations on mother.[6] He testified that mother suffered from major depression and "chronic mood disorder" and could not offer a time in which one could expect mother's mental health to improve substantially. Rather, he recommended a "wait and see" approach.

Mother also moved to strike Anderson's testimony based on there being no threshold determination of reliability regarding mother's chances of recovery or chance of having a depressive episode; thus, she argued that the circuit court should not admit Anderson's opinions as scientific expert testimony. Mother also contended that the science supporting Anderson's conclusions was so weak and unreliable that it did not pass the threshold test established in Spencer v. Commonwealth, 240 Va. 78 (1990). The circuit court denied mother's motion.

At the conclusion of NCDSS's case-in-chief, mother moved to strike the evidence. The circuit court denied her motion, disagreeing with mother's argument that her parental rights could not be terminated pursuant to Code § 16.1-283(C) because she had made substantial progress in improving her mental health.

Mother then testified that she had never missed a visitation, had taken C.P. to all of her regular checkups before NCDSS obtained custody of C.P., and that C.P. had sustained no actual injury during any visitation.

Father also testified, citing one occasion in which C.P. woke up at 3:00 a.m. with mother screaming at her, "shut the fuck up you little brat and go the fuck back to sleep." Moreover, father was opposed to C.P. being placed in mother's custody.

---

[6] Mother stipulated that Anderson was an expert in clinical and forensic psychology.

Mother then renewed her motion to strike at the conclusion of all the evidence, which the circuit court denied. During closing argument, C.P.'s guardian *ad litem* ("GAL") opined that it was fortunate that mother sought medical help but argued that the circuit court should terminate the parental rights of both parents. Regarding mother, the GAL was especially concerned with her judgment as affected by her mental health issues and, accordingly, her "inability" to make sufficient progress in improving her mental health.

The circuit court held that it was in C.P.'s best interests to terminate mother's parental rights pursuant to both Code § 16.1-283(B) and 16.1-283(C). The circuit court opined that mother's mental health issues had not been remedied despite the presence of extensive evidence on the efforts and services NCDSS had provided to mother. Accordingly, mother had been unable to substantially remedy the conditions that led to C.P.'s foster care placement within a reasonable period of time from the date the child entered foster care, notwithstanding the reasonable and appropriate efforts of NCDSS and other rehabilitative agencies to such end. Although mother moved the circuit court to reconsider, the circuit court denied her motion. This appeal followed.

II. ANALYSIS

A. Admission of Expert Opinion Testimony

Mother argues that "[u]nder Spencer v. Commonwealth, 240 Va. 78 (1990) and related jurisprudence, the circuit court erred by admitting expert testimony from two psychologists whose opinions stemmed from their use of unreliable, unscientific, and outmoded testing methods."

Spencer only applies in cases where a litigant is seeking to introduce scientific evidence—not opinion evidence. See id. at 97 (limiting the need to make a "threshold finding of

fact" regarding reliability to instances in which "scientific evidence is offered," which included the DNA evidence discussed in that matter).

The testimony of the two psychologists was based upon their opinions derived from their training, experience, and many hours of personal observation of mother. The psychologists only represented that science supported their methodology. The fact that their opinions were rooted in the field of psychology did not make them scientific within the meaning of Spencer and its progeny. Because the psychologists offered no scientific evidence, we find that the circuit court did not err in failing to make the "threshold finding of fact" regarding reliability required by Spencer.

### B. Termination of Parental Rights Pursuant to Code § 16.1-283(C)

Mother also contends that the circuit court erred "by terminating [her] parental rights without clear and convincing evidence that she failed to substantially remedy the circumstances resulting in the child's abuse, neglect, and/or continued commitment to foster care."

"[T]he rights of parents may not be lightly severed but are to be respected if at all consonant with the best interests of the child." Richmond Dep't of Social Servs. v. L.P., 35 Va. App. 573, 580 (2001) (quoting Ward v. Faw, 219 Va. 1120, 1124 (1979)). However, "the child's best interests" are the "paramount consideration of a circuit court" in cases where parental rights are at stake. Logan v. Fairfax Cty. Dep't of Human Dev., 13 Va. App. 123, 128 (1991). "In matters of a child's welfare, [circuit] courts are vested with broad discretion in making the decisions necessary to guard and to foster a child's best interests." Id. (quoting Farley v. Farley, 9 Va. App. 326, 329 (1990)).

Accordingly, "[w]here the [trial] court's judgment is based on evidence heard *ore tenus*, its decision to terminate a parent's rights is entitled to great weight and 'will not be disturbed on appeal unless plainly wrong or without evidence to support it.'" Thach v. Arlington County

Dep't of Human Servs., 63 Va. App. 157, 168-69 (2014) (quoting Logan, 13 Va. App. at 128).

We "review the evidence in the light most favorable to the party prevailing in the [trial] court."

Id. (quoting Tackett v. Arlington Cty. Dep't of Human Servs., 62 Va. App. 296, 303 (2013)).

Additionally, "the recommendation of the guardian *ad litem*, . . . while not binding or

controlling, should not be disregarded." Bottoms v. Bottoms, 249 Va. 410, 420 (1995). Thus,

we will not reverse the circuit court's judgment terminating mother's parental rights unless the

evidence, viewed in the light most favorable to NCDSS, shows that the circuit court abused its

discretion.

> A court may terminate parental rights if

>> [t]he parent or parents, without good cause, have been unwilling or
>> unable within a reasonable period of time not to exceed [twelve]
>> months from the date the child was placed in foster care to remedy
>> substantially the conditions which led to or required continuation
>> of the child's foster care placement, notwithstanding the
>> reasonable and appropriate efforts of social, medical, mental health
>> or other rehabilitative agencies to such end.

Code § 16.1-283(C)(2).

Because the best interests of the child are paramount, "the purpose of Code

§ 16.1-283(C)(2) is to ensure, if possible, that the best interests of the child are achieved by

'protect[ing] the family unit and attendant rights of both parents and child, while assuring

resolution of the parent-child relationship without interminable delay.'" L.P., 35 Va. App. at 584

(quoting Lecky v. Reed, 20 Va. App. 306, 312 (1995)). It is "not in the best interests of a child

to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of

resuming his [or her] responsibilities." Id. (quoting Kaywood v. Halifax Cty. Dep't of Soc.

Servs., 10 Va. App. 535, 540 (1990)). This remains true even in cases which "a parent's mental

deficiency" is the condition that led to the child's placement in foster care. See id. at 585

(reversing the circuit court's judgment and ordering residual parental rights terminated when the

"parent's mental deficiency" was "of such severity that there [was] no reasonable expectation that such parent [would have been] able within a reasonable period of time befitting the child's best interests to undertake responsibility for the care needed by the child in accordance with the child's age and stage of development").

In this case, mother, without good cause, had been unable to substantially remedy the conditions that led to C.P.'s foster care placement within a reasonable period of time in excess of one year from the date C.P. entered foster care. Despite the services NCDSS provided to mother over nearly eighteen months, there was no reasonable expectation that mother could have undertaken responsibility for the care C.P. needed in accordance with her age and stage of development within a reasonable period of time consistent with the child's best interests.

Mother's mental and psychological problems, including major depression with bipolar traits, rendered her unable to notice or adequately react to safety concerns and, additionally, frequently overwhelmed mother with the responsibilities involved in caring for C.P.

Mother entrusted the care of C.P. to NCDSS in 2017 because she could not properly care for her due to her mental and psychological problems, which included postpartum depression and suicidal ideation at that time. C.P. was about six months old at that time, and she has been in foster care ever since—for the majority of her life. C.P. is currently thriving under the care of her foster family, who wishes to adopt C.P., which would bring permanence and stability to her life.

As the GAL argued before this Court on appeal, mother continues to have "significant psychological challenges" because of her major depression with bipolar traits, despite the passage of time. As the circuit court properly inferred from the evidence, mother may not be able to adequately care for C.P. and regain custody of her for another year or more. Thus, although mother tried to remedy the circumstances that forced C.P. into foster care by

- 11 -

participating in all visitations, evaluations, and appointments for counseling, her major depression with bipolar traits remains so severe that it is highly unlikely that she can keep C.P. safe.

The best interests of the child is not a mechanical determination; rather, it rests upon the facts of each case. Toombs v. Lynchburg Div. of Soc. Servs., 223 Va. 225, 230 (1982). "In determining what is in the best interests of the child, a court must evaluate and consider many factors." Barkey v. Commonwealth, 2 Va. App. 662, 668 (1986). These factors include

> the age and physical and mental condition of the child or children; the age and physical and mental condition of the parents; the relationship existing between each parent and each child; the needs of the child or children; the role which each parent has played, and will play in the future, in the upbringing and care of the child or children; and such other factors as are necessary in determining the best interests of the child or children.

Id.

Here, the circuit court properly terminated mother's parental rights in accordance with C.P.'s best interests when mother's mental health impaired her ability to keep C.P. safe. Continually waiting to discover when, if ever, mother might be able to remedy the conditions that resulted in C.P.'s foster care placement only prolongs the lack of stability and permanency in C.P.'s life. This is especially true given the "intrinsic instability of the foster care environment." L.P., 35 Va. App. at 576. We also note that the GAL, who had been appointed to represent C.P.'s best interests, recommended that allowing C.P.'s foster family to adopt her would be in C.P.'s best interests.

For all of these reasons, the circuit court did not err in terminating mother's parental rights when the evidence clearly and convincingly established that mother failed to substantially remedy the circumstances (i.e. her mental health issues) resulting in C.P. being abused and neglected. C.P.'s best interests must prevail over the interest in preserving the parent-child

- 12 -

relationship between mother and C.P. when mother has remained unable to properly care for C.P. because of the severity of her mental and psychological problems.

### III.  CONCLUSION

For the foregoing reasons, we affirm the circuit court's judgment.

<u>Affirmed.</u>